ZEHMER, Judge
(dissenting).
I would reverse the conviction and remand for a new trial because two errors argued by appellant Stockton deprived him of a fair trial. First, the trial court reversibly erred in limiting defense counsel’s argument to thirty minutes. Second, the trial court reversibly erred in giving the jury part but not all of the required instruction on manslaughter when, pursuant to a request from the jury, the court undertook to explain the differences between second degree murder, third degree murder and manslaughter. Finally, if the judgment of conviction is not reversed, the reasons for departure from the guidelines sentence are invalid, requiring remand for resentencing in accordance with the guidelines rule.
The trial court abused its discretion in limiting counsel’s final argument to thirty minutes. This was not a simple case in *742 volving two or three witnesses with little or no conflict in the testimony. On the contrary, after the voir dire and selection of the jury, the presentation of fifteen witnesses consumed two days during which testimony stretched into the evening hours. This testimony, spread over more than 550 pages of transcript, is rife with conflicting versions of what happened on the occasion of the alleged offense. The entire trial transcript is 938 pages long. For a better understanding of the trial proceedings, I quote in part the summary of the testimony in appellant’s brief (omitting references to the record), which the state’s answer brief does not challenge as to accuracy.
The evidence established that Patrick Statham was killed in the aftermath of a brawl which broke out outside the Joe James Recreation Center, following a party in honor of (but not limited to) the Jacksonville Lee High School football team. The fight was precipitated by an argument which arose over one car blocking another car. At one point in the altercation, appellant (a non-student) was either shoved or hit by Milton Gordon, a Lee High linebacker. According to several state witnesses, appellant went back to his car, got a gun, pointed it in the direction of Milton Gordon and Patrick Statham (who were, or may have been, in the process of beating up a boy on the ground), and fired, striking Statham. According to appellant and one defense witness, appellant was not, and could not have been, the person who shot Patrick Statham, because of the positioning of the various participants; if appellant had fired toward Statham he would have hit one of his own friends. Another defense witness testified that he saw Raymond Bell pointing a gun at Statham.
Four state witnesses, Dianne Straw-bridge, Clarence Frazier, Alonzo Davis, and Milton Gordon claimed that appellant fired the fatal shot. A fifth state witness, Arthur Mitchell, saw appellant pointing the gun, but didn’t see him shoot it. Davis (who said he was as close to appellant at the time of the shooting as the distance from the witness stand to the jury box) claimed that immediately before the shooting appellant said, “I’ll kill one of you punks” and then, after the shooting, said “I told you I'd kill one of you punks.” Davis testified that anyone standing as close as he was, and not even necessarily that close, would have heard these statements — “I mean when he said it, he made it clear.” Milton Gordon said he heard appellant say, “I’ll kill one of you punks”; Clarence Frazier said he said, “Nigger, I’ll kill you”; and Arthur Mitchell (who said he was about six feet away from appellant, the distance from the witness stand to the beginning of the jury box) didn’t hear him say anything at all.
Anywhere from four to eight to a dozen or more people were participants in the fight, which took place in the midst of a crowd of onlookers. There were apparently a number of people in the vicinity with guns, and there was shooting going on both before and immediately after the shooting of Patrick Statham. Among those with guns were Raymond Bell; Arthur Mitchell’s brother; and a short, stocky individual named Charles, referred to as “New York,” whom at least one state witness (Charles Frazier) may have confused with appellant. The number of gunshots heard at the time Patrick Statham was shot varied from witness to witness — two, one, seven, four or five, two, one. While it is true that several state witnesses (including the aforementioned Clarence Frazier) identified appellant as the person who shot Patrick Statham, it is also true that several defense witnesses testified otherwise. Trevio Parks saw Raymond Bell pointing a gun in the direction of Patrick Statham, and said you couldn’t really tell who shot him. Parks also testified that the day after the shooting, Bell told him that he was the one who had killed the victim. Linda Spivey, appellant’s girlfriend, testified that Raymond Bell hollered out to her that he “killed that MF” but that Charles was going to do the time for it. Ralph Williams testified that appellant had a gun, but that he could not be the one who shot Statham because of the positioning of the people involved; *743 if he had fired in Statham’s direction “[he] would have hit one of us in the back.” Appellant testified that he fired into the air; if he had fired straight ahead he would have hit Bubba (Ralph Williams), Peanut, or Aaron. According to Raymond Bell, appellant told him (after the shooting but before .appellant’s arrest) that if the boy got shot in the back, he did it, but otherwise he didn’t do it. Appellant also expressed the same doubt to Detective Eason after his arrest, depending on whether Patrick Stat-ham got shot in the back or in the chest. During the conversation, Detective Ea-son led appellant to beliéve that the victim was shot in the back, and since appellant thought he was the only one standing behind him with a gun, he concluded that his shot must have hit him. The medical examiner, Dr. Floro, testified that Patrick Statham was shot in the chest. Now that he was aware of this fact, appellant testified that he did not shoot Statham.
There was conflicting evidence as to other material facts as well. Officer Rusty Rogers, who had been called to the scene of the disturbance before the shooting occurred, saw a short black male in a gray sweatshirt raise his arm to the victim’s chest level; Rogers then saw a muzzle flash. [Note that defense witness Ralph Williams described the other boy named Charles, or “New York,” as being about appellant’s height and wearing a gray shirt, while state witness Clarence Frazier mistakenly thought appellant and “New York” were the same person.] At least two state witnesses, Arthur Mitchell and Milton Gordon, had testified in deposition that appellant had his shirt off at the time he was pointing the gun at Statham and Gordon, though at trial Mitchell said he “can’t recall” whether appellant still had his shirt off, and Gordon claimed he wasn’t paying attention to that. Defense witness Ralph Williams testified that the shot that hit Statham could not have been fired by appellant and that appellant still had his shirt off when he (Williams) turned around after the shooting.
Appellant testified that he had gone back to the car to get his gun because he was upset and angry, after having been “blindsided” by Milton Gordon. When appellant got back to where the fight was, Gordon and Patrick Statham had a boy on the ground, and they were beating and kicking him. Appellant was concerned that the boy was getting seriously hurt. Appellant pointed his gun at Gordon. Gordon said to Statham, “Hey, he got a gun, let’s go”; he pulled Statham away and they started to leave. Bubba (Ralph Williams) jumped in between, and appellant fired into the air. As Gordon and Statham ran, appellant heard some more gunshots.
With regard to the person on the ground, the testimony of the state’s witnesses once again covered the spectrum. According to Dianne Strawbridge, in deposition, Patrick Statham was not even involved in the fight. At trial, she testified that he was trying to break it up. According to Clarence Frazier, Statham was trying to break up the fight; he was not hitting someone who was on the ground. Frazier did not recall testifying in deposition on the Tuesday before trial that Statham was hitting and fighting with a “dude” who had grabbed his leg; the court reporter must be lying if she wrote that down. But according to Milton Gordon, Patrick Statham “was beating up on” the guy on the ground, but he (Gordon) was not. Gordon denied having said in his deposition taken a week earlier that “Patrick and I” were beating up on the guy, or, if he did say that, there could be a different explanation. The court reporter was subsequently called as a witness and played a tape recording of Milton Gordon’s deposition, in which he stated at least four times in succession that (after Patrick came over to help him and they “kind of took control” of the fight) “we” or “Patrick and I” were beating up on this individual. “I was— we was just beating and knocking and I just never looked down to see who it was.”
*744 The only aspect of this trial about which there was no disagreement is (as Alonzo Davis put it), “Everybody see[s] their own different things,” or (as Arthur Mitchell put it), “Everybody going to have a different point of view to the story.” Accordingly, both the prosecutor and defense counsel questioned and cross-examined the witnesses at length as to the position and location of the various people involved.
Although the jury was selected during the early part of the week, the remainder of the trial took place on Thursday and Friday of that week. The Thursday proceedings continued until 8:30 p.m. After the last witness had testified late Friday afternoon, the trial court offered the jury a choice:
As I indicated to you yesterday that you possibly would rather stay late tonight or have to come back on Saturday. Monday is definitely out of the question, so those are the two alternatives we have available to us.
The trial judge also told the jury that closing arguments would “not take more than an hour total” and the jury instructions would take half an hour, but that he could not predict how long it would take for the jury to deliberate and reach a verdict. He then directed the jury to retire to the jury room and determine the majority’s preference, “and come back and see what your preference is because we’re all at your pleasure, so to speak.” While the jury was out, the trial judge said to counsel:
THE COURT: I hope they make the right decision, but, however, Mr. Link [defense counsel], I’ll just note that your objections are renewed since you reopened the case.
[[Image here]]
Assuming that we’re going into closing argument, contrary to my general policy, I have the feeling it’s going to be necessary that I limit closing arguments and I will be glad to listen to proposed limitations from counsel if you wish to make an expression.
MR. DECANDIO [prosecutor]: Your Honor, I would ask for 45 minutes. I believe that would be sufficient. It’s not a case that involves that much testimony, although it’s evidently been spread out.
THE COURT: I indicated to the jury the possibility of a total of an hour. But, Mr. Link, at any—
MR. LINK [defense counsel]: I generally take about 45 minutes, but on this one I’m not very well prepared so I really don't know, Judge. I would request an hour.
THE COURT: If they say they want to stay, we’re going to stay awhile, at any rate. I’m not sure how much we’re going to stay. We’ve got to be prepared for dinner again, I suppose. It’s very likely.
At that point the jury returned and announced to the court that it desired to stay and finish the case that night. The court immediately excused the jury for a ten-minute break and informed counsel that closing arguments would start in ten minutes and be limited to thirty minutes per side. Defense counsel objected to this limitation and also said:
Again, I’m not too well organized for my argument at this point and I feel 30 minutes in a case with as many witnesses as this and as significant a case as this is an improper restriction on closing arguments and denies my client effective assistance of counsel.
The court overruled the objection, had the jury brought in at 5:50 p.m., and instructed counsel for the state to proceed with closing argument.
The prosecutor’s initial argument consisted almost entirely of general comments lasting approximately nine minutes and covering just over six pages of the transcript. He neither analyzed the evidence in detail nor acknowledged any conflicting testimony; instead he merely argued that the evidence was clear and undisputed that defendant shot and killed the victim Stat-ham.[1] He argued that although defendant *745 intended to shoot Milton Gordon but hit Statham instead is no defense to second degree murder. Defense counsel’s argument attempted to analyze in detail the conflicting testimony of the witnesses for both the state and the defense and to make some sense out of the evidence as a whole, but this argument was poorly organized and reflected a manifest lack of meaningful preparation and intelligible presentation to the jury which was attributable, in substantial part, to defense counsel’s haste to cover all the evidence in detail in the limited time given him. After a little more than thirty minutes elapsed, the court interrupted and told counsel he would be allowed three more minutes to conclude, because some time had been consumed by the prosecutor’s objections. Defense counsel’s argument thus lasted a total of thirty-six minutes and covered twenty-six pages of transcript. The court allowed the prosecutor twenty-four minutes for rebuttal argument, during which numerous defense objections were made to the prosecutor’s alleged misstatements regarding specific testimony of witnesses.
After argument concluded, the jury was sent to another court room to have dinner and the judge conferred briefly with counsel about some charges. The trial was recessed for thirty minutes until approximately 7:35 p.m., at which time the jury returned. The court’s instructions were then given to the jury (covering 20 pages of transcript), and the jury retired to deliberate at 8:13 p.m. At approximately 9:45 p.m. the jury requested that the court “explain the difference between second and third degree murder again” (R. 926). After consultation with counsel, and over the objection of defense counsel, the court rein-structed the jury on the definition of second and third degree murder and manslaughter, but omitted mention of justifiable and excusable homicide in giving the definition of manslaughter. The jury again retired, and at 10:16 p.m. returned its verdict of guilty of second degree murder as charged.
Without discussing the complete argument and omissions of defense counsel as set forth in the extended discussion under point two of appellant’s brief, my review of the record confirms that defense counsel failed to comment upon evidence that went to the heart of the defense, apparently because of the time limitation. As appellant’s brief points out in part:
While the evidence at trial was conflicting as to both the circumstances of the shooting and the identity of the perpetrator, there was testimony before the jury that (1) Raymond Bell, a participant in the melee, had a gun, (2) appellant was not in a position where he could have shot Patrick Statham, (3) Raymond Bell was pointing his gun in the direction of Statham immediately before the latter was shot, and (4) Bell had later admitted to two different individuals that he, not appellant, had shot the victim (but that appellant was going to do the time for it). The failure of counsel, after introducing all of this evidence, to even mention it in his closing argument was irreparably prejudicial; it effectively sabotaged appellant’s most viable defense....
[[Image here]]
Given the testimony that Raymond Bell was pointing a gun in the direction of the victim, and that he later told Trevio Parks and Linda Spivey that he was the one who shot him, it could (and should) have been argued that Bell may have committed the murder. Given the testimony that another individual named Charles (or “New York”), who was about appellant’s height and who was wearing a gray shirt, was in possession of a gun, and given the fact that at least one of the state’s witnesses, Clarence Frazier, mistakenly thought appellant and “New *746 York” were one and the same, and argument was available that the state’s witnesses may have seen the boy from New York fire the shot, and confused him with appellant. This possibility is strengthened by the fact that Officer Rusty Rogers ([an eye witness] who could not identify the perpetrator) saw the shot fired by a short black male in a gray sweatshirt, while two of the state’s key witnesses (Mitchell and Gordon) had stated in their depositions that, when they saw appellant pointing his gun, he had his shirt off. Complicating matters still further is the fact that Detective Eason and Raymond Bell each claimed that appellant admitted that he fired the fatal shot on the assumption that the victim was hit in the back. Both Eason and Bell indicated that appellant was not really sure whether it was his bullet that struck the victim, depending on whether he was hit in the back or in the chest. The victim was, in fact, shot in the chest.
Obviously this was a case in which the lawyer’s function in closing argument was of paramount importance. The allowance of reasonable time to explain the diverse versions of the event to the jury was essential to the defendant’s right to a fair trial.
A trial judge may limit closing argument in the exercise of his discretion, but that discretion must be exercised within reasonable bounds. In Pittman v. State, 440 So.2d 657 (Fla. 1st DCA 1988), we held that limiting argument to 30 minutes was reversible error under the circumstances, stating:
Generally, the time allowed for closing argument by counsel is within the discretion of the trial court. May v. State, 89 Fla. 78, 103 So. 115 (1925). That discretion is not unbridled, however, and reversal is required where the time for argument is unreasonably limited. What amounts to a reasonable time depends upon the facts and circumstances of each case. Id.
In May, it was held that limitation of argument to 20 minutes was an abuse of discretion considering the severity of the potential sentence, the sharp conflicts in testimony, and the number of witnesses testifying. In Cooper v. State, 106 Fla. 254, 143 So. 217 (1932), it was held that limiting closing argument to five minutes was, on its face, an abuse of discretion. A limitation of closing argument to 30 minutes was held not to be an abuse of discretion in McDuffee v. State, 55 Fla. 125, 46 So. 721 (1908). However, the Florida Supreme Court noted in that case that the trial was short, that the transcript covered only eleven pages, and that only four witnesses testified for each side.
In the instant case, there were a total of 33 witnesses. There were seven different defendants, each of whom was charged with a third degree felony, and two of whom were charged with two third degree felonies. Counting voir dire, this trial took approximately four days and covered over 700 pages of transcript. In view of the foregoing facts and authority, limitation of argument in this case to 30 minutes was an abuse of discretion, and we are compelled to reverse and remand for a new trial.
440 So.2d at 658-59.
Similarly, in Hickey v. State, 484 So.2d 1271 (Fla. 5th DCA), rev. denied, 492 So.2d 1335 (Fla.1986), the court held that limitation of argument to 30 minutes was error under the circumstances, noting:
The appellant contends that the trial court abused its discretion by unreasonably limiting closing argument in this murder trial to 30 minutes per side, thus, he says, depriving him of his constitutional right to due process and to a fair trial. The trial consumed four days. The transcript of the testimony consists of almost 750 pages of the record, and the entire trial transcript runs close to 900 pages. This was a bitterly fought trial, full of acrimony between the prosecutor and defense counsel, and replete with verbal altercations between the defense counsel and the trial judge....
In several recent cases, we have disapproved severe limitation of closing argument in criminal cases. [Citations omitted.] Other district courts have done the same. [Citations omitted.] In the case *747 before us, the defense counsel requested one hour for closing argument. Because the prosecutor asserted that 30 minutes should be enough, the court restricted argument to that time, and announced in advance that he would not even hear or consider a motion to extend the time if, as the deadline approached, defense counsel was not finished and thought some more time was required. Defense counsel was cut off when his time had run. We fail to see how a few minutes longer of closing argument would have impeded the administration of justice in this case. In May v. State, 89 Fla. 78, 103 So. 115 (1925), the Florida supreme court held that although no hard and fast rule could be prescribed, if it appeared that time for argument was unreasonably limited, such action would constitute an abuse of discretion requiring the reversal of a judgment for a new trial. In Herring v. New York, 422 U.S. 853, 859, 95 S.Ct. 2550, 2553, 45 L.Ed.2d 593, 598 (1975), the United States Supreme Court said:
There can be no doubt that closing argument for the defense is a basic element of the adversary factfinding process in a criminal trial. Accordingly, it has universally been held that counsel for the defense has a right to make a closing summation to the jury, no matter how strong the case for the prosecution may appear to the presiding judge.
The cases which have reversed judgments because of unreasonable restriction of closing argument are indicative of the concern that in a criminal case, considerable leeway must be given to defense counsel in arguing his case to the jury. The court should not unduly restrict this argument even where the State’s case is strong and the court believes the defense has very little about which to argue. Foster v. State, 464 So.2d 1214 (Fla. 3d DCA 1984). It is for the jury, not the trial judge, to determine the strength or weakness of the State’s case and of the proffered defense. Herring v. New York, supra. Arbitrarily limiting a defendant’s closing argument to 30 minutes in a murder trial which has been going on for four days, no matter how vexing the lawyer’s behavior has been, seems to us to be an unreasonable restriction of the defendant’s right to present his case to the jury.
484 So.2d at 1273-74.
The majority decision in this case does not follow the admonitions in Pittman and Hickey but relies entirely on McDuffee v. State, distinguished in the above quote from Pittman. Yet this case is a far cry from the short trial with few witnesses and eleven pages of transcript involved in McDuffee. This case is far more analogous to the circumstances in Pittman and Hickey in terms of length of trial (a two and one half day trial lasting into the night on both days) and length of transcript (over 550 pages of testimony and 938 pages for the entire trial). The defendant was on trial for second degree murder, a serious offense that subjected him to imprisonment for 40 years (the sentence imposed). Numerous witnesses gave conflicting testimony concerning defendant’s guilt. The defendant’s theory of defense — that while he could have shot Statham in the back, he could not have been the one who shot Stat-ham in the chest, and that the witnesses who identified him as the person who did shoot Statham in the chest had confused defendant with another person at the scene — required full and intelligible exposition based on detailed review of each witness’s testimony which the time limitation did not permit. Had defense counsel been able to more fully analyze the facts in light of this defense, the jury’s verdict may well have been different. I cannot conclude that absent the unreasonable limitation on counsel’s argument, the verdict nevertheless would have been the same. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
The limitation of argument to 30 minutes is simply not sustainable on this record. The only reason for the limitation discernible from this record was the court’s expressed desire to accommodate the personal convenience of the jury — they could, if they so elected, finish the case late Friday night and avoid returning to court on Sat *748 urday. Because the state requested 45 minutes for argument, and defense counsel requested at least one hour, the court’s 30-minute restriction conforming to his previous comment to the jury that closing argument would not “take more than an hour total” is patently arbitrary.
More importantly, for the court to permit the jury to decide whether the trial should proceed late into Friday night rather than resume on Saturday morning demeaned the dignity of the proceedings, detracted from the seriousness of the charge being tried, and offended the defendant’s right to a full, fair and impartial trial. After all, a trial is a proceeding designed to determine the truth and reach a just verdict with all participants mentally and physically alert; it should never become a marathon to test the participants’ endurance. Regardless of the strong temptation to complete the proceeding Friday night and avoid the inconvenience of returning Saturday, it was the court’s function, not the jury’s, to insure a fair trial for both parties. Mere personal convenience to the jury, the judge and court personnel should never serve as the reason for limiting closing argument. An overnight recess when the presentation of evidence had concluded would have allowed the trial to resume the following morning with all participants rested and refreshed. Not only would the jury then have been more alert during counsels’ closing arguments, the court’s lengthy instructions, and the jury’s deliberations, but counsel for the state and the defendant would have been afforded ample time to prepare a more carefully organized and understandable argument to better assist the jury in carrying out its duty to determine the truth and reach a just verdict on the evidence. Of course, the only apparent need for limiting closing argument to 30 minutes also would have dissipated. This was not an instance where the court was faced with another trial set to commence the following morning or some similarly compelling circumstance that demanded completion of this trial on Friday night. I am, therefore, unable to harmonize the result in this case with that in Pittman and Hickey, and would reverse and remand for a new trial on this ground.
Next, it was error for the trial court to deny defendant’s request to reinstruct the jury on excusable and justifiable homicide once the court decided to reinstruct on manslaughter. Because manslaughter is defined as much by what it is not as by what it is, an instruction defining manslaughter is incomplete and legally insufficient if not accompanied by an instruction on justifiable and excusable homicide. Hedges v. State, 172 So.2d 824 (Fla.1965); Kelsey v. State, 410 So.2d 988 (Fla. 1st DCA 1982). Had the trial court deemed that the jury’s request could be satisfactorily answered by merely instructing on second and third degree murder, a different question would be presented. Although the specific request was to distinguish between second and third degree murder, since the latter is a felony of the second degree, § 782.04(4), Fla.Stat. (1985), as is manslaughter, § 782.07, Fla.Stat. (1985), the trial court undoubtedly determined that the similarity in degree and definition of criminal conduct made it necessary to include reinstruction on manslaughter as well as third degree murder. This was an eminently sound decision in my opinion. But, having made it, the judge also should have given a complete reinstruction on manslaughter.[2]
The decision in Henry v. State, 359 So.2d 864 (Fla.1978), does not support a different result in this instance because that case involved the jury’s request to explain the difference between first and second degree murder, both being crimes of different degree and distinguishable in definition principally by the element of premeditation. The supreme court’s rationalization in that opinion that when the jury requested clarification between first and second degree murder “it is apparent that the jury had *749 already made that determination [that an unlawful killing had occurred] by requesting merely a clarification of the ‘difference’ between first and second degree murder” because “had they not determined whether the homicide was lawful or unlawful, they would have solicited reinstructions on justifiable and excusable homicide or the other degrees of unlawful homicide, or both” (359 So.2d at 868), is mere dictum at best and manifest speculation at worst. But most assuredly this rationalization was not intended to be a statement of legal principle or the holding of the case, for the court further noted in limiting its decision to the “facts of this case”:
We can contemplate numerous situations where the jury’s request does not suggest necessarily that they have already determined whether a homicide has been lawful or unlawful. In those situations, the defendant is entitled to reinstructions on lawful homicide.
359 So.2d at 868. Nothing in the instant case demonstrates that when the jury made its request it had already determined the killing was unlawful or, more importantly, that it had considered and finally rejected the offense of manslaughter. The Henry decision does not, therefore, support the majority decision approving the failure to include instructions on excusable or justifiable homicide.
Finally, the trial judge gave three reasons for departure from the recommended guidelines sentence:
1) The Sentencing Guidelines recommendation of 17-22 years is insufficient for retribution, deterrence, rehabilitation and for the safety of the public....
2) The Defendant’s criminal history all consisting of juvenile records, indicates that a prison term of 17-22 years is inadequate punishment for this Defend-ant_ The Defendant’s criminal history is set forth in the presentence investigation.
3) The Defendant’s possession and ownership of a firearm was an admitted violation of the terms of his California parole and but for this violation the murder would not have occurred.
R. 99-100. The first reason merely reflects disagreement with the guidelines recommendation and is legally insufficient. Scurry v. State, 489 So.2d 25 (Fla.1986). The second reason is legally insufficient as stated, because some of the prior juvenile offenses were scored on the guidelines scoresheet. Since other juvenile offenses occurred more than three years prior to this offense and could not be scored, these particular offenses, if properly identified by the trial judge, could serve as a valid reason for departure. Weems v. State, 469 So.2d 128 (Fla.1985). The third reason essentially is a finding that defendant violated conditions of his California probation, but the record fails to show any adjudication of such violation. Because reference to the commission of offenses for which there has not been a conviction is impermissible under the rule, it follows that the third reason is likewise invalid. If the conviction is not to be reversed for the reasons stated above, I concur in the majority’s decision to vacate the sentence for invalidity of the reasons for departure and, in accordance with Albritton v. State, 476 So.2d 158 (Fla.1985), to remand for resen-tencing.

. The prosecutor stated in part:
Second, the state must prove that the death was caused by the criminal act or agency of *745 Charles L. Stockton. You have heard no testimony from this stand over the last two days to indicate anything other than the fact that Charles Stockton pulled the trigger and is responsible for the death of Patrick Statham. Every witness that testified to having seen the shooting itself told you, in fact, that from a distance of a very few feet that each saw Charles Stockton pull the trigger and kill Patrick Statham.
R. 855. The accuracy of this characterization of all the testimony is questionable, but defense counsel made no objection at this time.

. The note to the manslaughter instruction in Florida Standard Jury Instructions in Criminal Cases states, "In the event of any reinstruction on manslaughter, the instructions on justifiable and excusable homicide on page 61 should be given at the same time," citing Hedges v. State, supra.